IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| GARY GRANDISON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:20-CV-483-WKW |
| | ) | [WO] |
| ALABAMA STATE UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gary Grandison coached the women's golf team at Alabama State University for more than a decade.  Under his leadership, the women's golf team won seven Southwestern Athletic Conference (SWAC) championships, and Plaintiff was named the SWAC women's golf coach of the year five times.  This all came to an end in 2019:  Plaintiff's coaching contract was nonrenewed, and he was out of a job.

Plaintiff sues his former employer, Alabama State University ("ASU"), under Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. § 1681 *et seq.* ("Title IX").  He alleges that "on the basis of sex," ASU refused to renew his coaching contract and paid him less than coaches of men's sports teams.  20 U.S.C. § 1681(a).  He also brings a supplemental state-law claim for breach of contract.

At the conclusion of discovery, ASU moved for summary judgment on all claims.  (Doc. # 18.)  That motion has been fully briefed.  (Docs. # 19–20, 23–25.)  Because Plaintiff has not demonstrated a prima facie case of discrimination or shown that ASU's legitimate, nondiscriminatory reasons for its employment decisions were pretext for discrimination, ASU's motion for summary judgment is due to be granted on the Title IX claims.  Supplemental jurisdiction will be declined on the state-law claim.

## I.  JURISDICTION AND VENUE

Subject matter jurisdiction is proper pursuant to 28 U.S.C. §§ 1331 and 1367.  Personal jurisdiction and venue are uncontested.

## II.  STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The court views the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmoving party.  *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 820 (11th Cir. 2010).

The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for the motion." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  This responsibility includes identifying

the portions of the record illustrating the absence of a genuine dispute of material fact. *Id.* Alternatively, a movant who does not have a trial burden of production can assert, without citing the record, that the nonmoving party "cannot produce admissible evidence to support" a material fact. Fed. R. Civ. P. 56(c)(1)(B); *see also* Fed. R. Civ. P. 56 advisory committee note ("Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials . . . . [A] party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.").

If the movant meets its burden, the burden shifts to the nonmoving party to establish—with evidence beyond the pleadings—that a genuine dispute material to each of its claims for relief exists. *Celotex Corp.*, 477 U.S. at 324. A genuine dispute of material fact exists when the nonmoving party produces evidence allowing a reasonable fact finder to return a verdict in its favor. *Waddell v. Valley Forge Dental Assocs. Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).

## III.  BACKGROUND

### A.  Plaintiff's Contracts as Head Golf Coach

Plaintiff joined ASU in 2003 as an assistant professor of marketing.[1]  (Pl. Dep., at 16–17 (Doc. # 20-14); Pl. Decl. ¶ 4 (Doc. # 23-1)[2].)  In the fall of 2007, he took on the extra position of head golf coach, coaching both the men's and women's golf teams.  His combined salary was $68,650.  (ASU 2017 Not. of Emp. (Doc. # 20-1); Pl. Dep., at 23–24.)  He continued in the dual role of assistant professor and head golf coach until January 23, 2013, when he signed a new contract solely as the head golf coach ("2013 Contract").  The 2013 Contract specified a salary of $31,915 in addition to a $600 monthly car allowance and designated performance bonuses for winning championships and exceeding academic markers.  (2013 Contract (Doc. # 20-4); Pl. Dep., at 24.)

On May 9, 2016, Plaintiff negotiated a new contract as the head coach of the men's and women's golf programs.  The contract was effective August 1, 2015, through June 30, 2018, with an increased annual salary of $55,000 ("2015 Contract").  (Pl. Dep., at 27–28; 2015 Contract (Doc. # 20-5); Pl. Decl. ¶¶ 13–14.)  The agreement also contained monetary incentives, including a $30,000 longevity

---

[1] Plaintiff has a bachelor's degree in finance, a master's degree in sports science and sports management, and a doctoral degree in sports management.  (Pl. Dep., at 13–14; Pl. Decl. ¶¶ 2, 3.)

[2] Where a deposition is cited, the cited pages refer to the deposition pages.  Citations otherwise use the pagination as listed in CM/ECF.

4

bonus payable incrementally, five performance-based bonuses ($6,000 for each SWAC championship, $10,000 for each Coach of the Year Award, $5,000 for advancing to the NCAA Nationals, $10,000 for each NCAA or Minority Championship, and $15,000 for academic awards), and a $600 monthly car allowance.   The 2015 Contract also guaranteed annual budgets for recruitment ($10,000), for payment of assistant coaches ($50,000 salary pool), travel ($75,000), and materials and services ($20,000).

After the 2015 Contract expired on June 30, 2018, the then-Athletic Director Jennifer L. Williams recommended the renewal of Plaintiff's contract for one year until July 1, 2019.   (Williams Mem. (Doc. # 20-6).)   Plaintiff's salary remained $55,000, and the contract specified that $21,489 would be paid from the women's golf budget and that $33,511 would be paid from the men's golf budget ("2018 Contract").   (2018 Contract (Doc. # 20-7); Pl. Decl. ¶¶ 23, 24.)   Additionally, under the 2018 Contract, Plaintiff's performance-based incentives were reduced to three: $3,500 for winning the SWAC championship; $5,000 for being crowned Black College national champions; and $3,000 for exceeding the team's multi-year academic progress rate (APR) of 950.   (Pl. Decl. ¶ 28; Williams Mem.)   The 2018 Contract did not include a monthly car allowance or a longevity bonus, as in the 2015 contract.   (2018 Contract.)

Plaintiff contends that ASU breached two of his three coaching contracts, namely, the 2015 and 2018 Contracts.  For example, in breach of the 2015 Contract, ASU paid him one-sixth ($5,000) of his earned longevity bonus ($30,000).  (Pl. Decl. ¶¶ 16–19; Pl. Dep., at 91; Pl. Ex. 2-Recommended Offer Sheet (Doc. # 23-2).)  ASU also did not pay Plaintiff bonuses he earned for his female student-athletes' successful performance in the classroom and for meeting several contractual performance bonuses, including "being named SWAC Coach of the Year . . . ."  (Pl. Decl. ¶¶ 20–22; *see also* Pl. Dep., at 92.)  As concerns the 2018 Contract, Plaintiff testifies that he won the SWAC championship in 2018 but that he did not receive a $3,500 bonus.  (Pl. Decl. ¶ 29.)

Plaintiff's contracts also did not yield the salaries of other coaches' contracts for men's sports teams.  Plaintiff earned less than the head coaches for football, men's basketball, and baseball.  (Head Coach Salaries (Doc. # 23-3); Pl. Decl. ¶¶ 41–44; Pl. Dep., at 47.)  He also earned less than the assistant coaches for football, men's basketball, baseball, men's track, men's tennis, and men's cross-country.  (Pl. Dep., at 48–52.)

**B.**   **Perceived Inequities Between the Women's Golf Team and Men's Sports Teams**

Plaintiff incorporates into his Title IX claims perceived inequities between the women's golf team and other men's sports teams at ASU.  First, he points to his

operating budget for the women's golf program, which in two years dwindled from $36,000 annually to $13,000 annually.  (Pl. Decl. ¶¶ 32–33; Pl. Dep., at 56–57.)  The reduction in funds required the women's golf team to fundraise to satisfy the costs of ASU-sanctioned activities and travel-related expenses.  (Pl. Decl. ¶ 34; Pl. Dep., at 58.)  Other teams, namely, football, men's basketball, baseball, and men's track, did not have to fundraise to cover their school-sanctioned activities.  (Pl. Decl. ¶ 35; Pl. Dep., at 68, 70; Terrance Jones Dep., at 43–44 (Doc. # 20-10)[3].)  Plaintiff also had to spend $7,000 of his own money to cover approved expenses for travel and competitions for the women's golf program.  (Pl. Decl. ¶¶ 30–31; Pl. Dep., at 99–101.)

Second, the female golf players in the 2017 and 2018 graduating classes did not receive their senior portraits.  In contrast, the seniors on the men's golf team and "other participants in male sports received their senior portraits."  (Pl. Decl. ¶ 37; *see also* Pl. Dep., at 58–65.)

Third, a female golf player on his team was denied reimbursement for an injury she suffered while on ASU business, but Plaintiff is "not aware of any male student-athletes not receiving reimbursement for medical expenses incurred from injury while engaged in college athletics."  (Pl. Decl. ¶ 38; Pl. Dep., at 65–67.)

---

[3] During the events that form the basis of this lawsuit, Terrance Jones served as senior associate director of athletics and then deputy director of athletics.  (Jones Aff. ¶ 2 (Doc. # 20-13).)

Fourth, Plaintiff has not received championship rings for winning SWAC championships in 2018 and 2019.  (Pl. Decl. ¶ 36; Pl. Dep., at 83–84; Pl. Dep., at 57 ("[T]to this day I still have not received the . . . 2018–2019 championship rings as a women's golf coach").)

## C.  The Investigation into Allegations of Misconduct Against Plaintiff and the Nonrenewal of His Contract in 2019

Prior to the expiration of the 2018 Contract, the athletic director recommended to ASU President Quinton Ross that Plaintiff be placed on administrative leave pending an investigation into allegations of misconduct reported by female student athletes and their parents.  (Apr. 26, 2019 Mem. (Doc. # 20-8).)  In one instance, it was reported that Plaintiff had made inappropriate comments to a player on the women's golf team about her lifestyle and that he had refused that player's request to wear pants instead of a skort during competitions.  Another reported incident concerned Plaintiff's allegedly inappropriate comments concerning a female golf player's sexual relationship with her boyfriend.  (Jones Dep., at 25–32.)  There also were complaints—"more than a few"—from parents against Plaintiff.  (Jones Dep., at 37.)

ASU's president approved the athletic director's request on April 26, 2019. (Apr. 26, 2019 Mem.)  The same day, Plaintiff was placed on administrative leave with pay "until further notice."  He also was prohibited from contacting any student

athletes on the golf team or their families or "from coming to the campus."  (Letter to Pl. re: Administrative Leave (Doc. # 20-9).)

Plaintiff contends that the complaints were overblown and false.  He says that the complaints originated because he did not allow the women golf players "to dress out of uniform" and because another female golf player perceived his compliment as "being aggressive."   (Pl. Dep., at 79–80; *see also* Jones Dep., at 33 (acknowledging that Plaintiff denied the accusation that he had talked to a player about her sexual relationship with her boyfriend).)  However, ASU concluded that there was "some merit" to the accusations.  (Jones Dep., at 23.)  ASU officials, including Deputy Athletic Director Terrance Jones, met with Plaintiff to discuss the complaints and how to move forward, but after this meeting, the administration received additional complaints against Plaintiff.  (Jones Dep., at 23–24.)

Jones testified about another incident where Plaintiff was accused of having "a physical altercation on the golf course with a student athlete, which at that time, we had to send other administrators . . . to relieve him and have him come back to Montgomery."[4]  (Jones Dep., at 24.)  Jones testified that he directed Plaintiff not to attend practice with the women's golf team until an investigation was completed.  Jones contends that Plaintiff disobeyed the directive and, at the practice, berated the

---

[4] It is unclear whether this alleged event occurred before or after ASU officials' meeting with Plaintiff.

same student athlete "to the point where she had to receive counseling." (Jones Dep., at 24, 40.)

On May 20, 2019, Jones sent a memorandum through the athletic director to ASU's president recommending the nonrenewal of Plaintiff's contract and payment to Plaintiff of the remainder owed under his existing contract. (Jones May 20, 2019 Mem. (Doc. # 20-11).) The president approved the recommendation. (Doc. # 20-11.)

In a letter dated May 30, 2019, ASU notified Plaintiff of his "non-reappointment as Head Golf Coach in the Athletic Department effective May 30, 2019." (May 30, 2019 Termination Letter (Doc. # 20-12).) The letter did not articulate any reasons for ASU's decision.

During his deposition, Deputy Athletic Director Jones articulated that Plaintiff was terminated for three reasons. First, Plaintiff's one-year contract was expiring. Second, Jones cited the complaints that students and their parents had made against Plaintiff, which ASU had determined had some merit. Third, Jones testified that the event involving Plaintiff's alleged altercation with a student-athlete and Plaintiff's insubordination also were factors in the decision not to renew Plaintiff's contract. (Jones Dep., at 23–24.) Jones testified that, for these reasons, ASU "opted not to renew his contract . . . in order to protect the greater good and the integrity of the programs" for women's and men's golf. (Jones Dep., at 25; *see also* Jones Aff. ¶ 7

(Doc. # 20-13).)  Plaintiff contends that no coach of a men's sports team had a championship record that matched that of his women's golf team, yet each of these coaches benefitted from a renewed contract.  (Pl. Dep., at 52–54.)

Following the nonrenewal of his contract, Plaintiff filed this two-count complaint against ASU.  In Count One, Plaintiff alleges that ASU violated Title IX by paying him less than "less accomplished and less proven coaches of men sports teams," and by failing to renew his contract for the 2019–20 academic year, "while contracts of coaches of poorer performing men sports were" renewed.  (Compl., at 7 (Doc. # 1).)  Count Two is a state-law claim for breach of contract.  Plaintiff alleges that ASU breached the 2015 and 2018 contracts, by failing, among other things, to pay longevity bonuses, performance-based bonuses, and out-of-pocket expenses. Plaintiff seeks compensatory damages, back pay, reinstatement, and injunctive and declaratory relief.  (Compl., at 10.)  ASU filed an Answer denying all claims, and the parties engaged in discovery.  ASU now has moved for summary judgment.

## IV.  DISCUSSION

The parties' briefing raises three issues:  (1) whether Plaintiff's Title IX employment discrimination claims are preempted by Title VII's statutory scheme; (2) if not, whether ASU violated Title IX when it failed to renew Plaintiff's contract and denied him the higher salaries that coaches for men's sports teams earned; and (3) whether state sovereign immunity bars Plaintiff's breach-of-contract claim.

There is a circuit split on the question of Title VII's preemption of employment discrimination claims brought under Title IX.  (*See* Pl. Summ. J. Br., at 14 (collecting cases) (Doc. # 23).)  The Eleventh Circuit has not yet weighed in on the issue.  *See Heatherly v. Univ. of Ala. Bd. of Trustees*, 778 F. App'x 690, 694 (11th Cir. 2019) ("We . . . need not reach the question—as yet undecided in this Circuit—whether Title VII preempts Title IX when a plaintiff alleges employment discrimination on the basis of sex and Title VII affords a parallel remedy.").  The preemption issue need not be reached here either because, even if the Title IX claims are not preempted, Plaintiff has failed to create a genuine dispute of material fact on his Title IX claims.  Because no federal-law claims remain, supplemental jurisdiction over the breach-of-contract claim will be declined under § 1367.

**A.    Title IX Discrimination Claims:  The Nonrenewal of Plaintiff's Contract and Pay Disparities**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  § 1681(a).  Plaintiff alleges that his contract as head coach of the women's golf team was not renewed based on his status as the coach of a female athletic team and that he was paid less than coaches of men's sports teams in

violation of Title IX.   (Compl. ¶ 20.)   Plaintiff's claims are employment discrimination claims.

Title IX does not provide an analytical framework for evaluating a claim of sex discrimination in employment.  Acknowledging the absence of Eleventh Circuit authority, the parties rely on decisions from other circuits that have applied Title VII's substantive standards for proving discriminatory treatment under Title IX. *See, e.g., Preston v. Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 206 (4th Cir. 1994) ("Title VII principles should be applied to Title IX actions, at least insofar as those actions raise employment discrimination claims."); *Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 832 (10th Cir. 1993) (Title VII is "the most appropriate analogue when defining Title IX's substantive standards . . . ."); *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 897 (1st Cir. 1988) (Title IX's legislative history "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII.").  The court will do the same.[5]

Discrimination under Title VII may be proven by either direct or circumstantial evidence.  *Crawford v. Carroll*, 529 F.3d 961, 975–76 (11th Cir.

---

[5] The analysis assumes, without deciding, first, that Plaintiff's employment discrimination claims avoid Title VII preemption and can proceed under Title IX, and second, that Title IX permits Plaintiff to bring an employment discrimination claim based on the gender of the athletes Plaintiff coached, rather than based on Plaintiff's gender.

2008).   Proof by circumstantial evidence typically invokes the burden-shifting *McDonnell Douglas* framework.  *See Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767 (11th Cir. 2005) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).   Under *McDonnell Douglas*, a plaintiff can establish a prima facie case of discrimination in employment by showing "(1) that []he belongs to a protected class, (2) that []he was subjected to an adverse employment action, (3) that []he was qualified to perform the job in question, and (4) that h[is] employer treated 'similarly situated' employees outside h[is] class more favorably." *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc) ("*Lewis I*").   If the employee demonstrates a prima facie case of discrimination, the burden shifts to the employer to show a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* at 1221.   "Finally, should the defendant carry its burden, the plaintiff must then demonstrate that the defendant's proffered reason was merely a pretext for unlawful discrimination . . . ." *Id.*

Invoking this framework, Defendant argues that Plaintiff cannot establish a prima facie case of discrimination because there is an absence of evidence of a similarly situated comparator for Plaintiff's claims (the fourth element). Additionally, Defendant contends that it had legitimate reasons for not renewing Plaintiff's contract and for the pay disparity and that Plaintiff has not shown that those reasons are pretextual.  (Def. Summ. J. Br., at 10–13 (Doc. # 19).)

14

1.      *The Nonrenewal of Plaintiff's Contract*

On Plaintiff's claim alleging the nonrenewal of his contract, Defendant contends that Plaintiff has not shown a similarly situated comparator to establish the fourth element of the prima facie case.  Plaintiff's proffered comparator must be "similarly situated in all material respects." *Lewis I*, 918 F.3d at 1218.  For cases involving alleged discrimination in the application of discipline for employee misconduct, a plaintiff must show that he "has engaged—either (a) disputedly or (b) admittedly—in misconduct similar to persons outside the protected class" whom the employer treated more favorably.  *Jones v. Bessemer Carraway Med. Ctr.*, 137 F.3d 1306, 1311 n.6 (11th Cir.), *vacated and superseded in part on other grounds on denial of reh'g*, 151 F.3d 1321 (11th Cir. 1998).  Hence, a similarly situated comparator would be a coach of a men's sports team who was accused of engaging in similar misconduct as Plaintiff but whose contract was renewed.

Plaintiff argues that he "established a standard of excellence" in the ASU's women's golf program (Pl. Summ. J. Br., at 17 (Doc. # 23)), and that no coach of a men's sports team had a record as stellar as his, yet each benefitted from a renewed contract.  (Pl. Dep., at 51–54.)  But Plaintiff's focus is wrong; his performance record as the head coach of the women's golf team is not the test for defining a similarly situated comparator.  He has not pointed to a coach of a male sports team who was accused of engaging in similar conduct but whose contract was renewed.  His

15

contention that "complaints against coaches from student-athletes and their parents w[ere] not uncommon" is too generic to satisfy his burden.  (Pl. Summ. J. Br., at 18.) The evidence to which he points does not set forth the nature of the accusations from which a comparison can be made.  (*See, e.g.*, Jones Dep, at 37 ("Q. Does your department ever get any complaints from parents . . . for the football team?"  A.  Yes, sir.").)  Plaintiff's failure to point to a similarly situated comparator means that he cannot satisfy the traditional *McDonnell Douglas* test for establishing a prima facie case.

Even if Plaintiff could point to a similarly situated comparator, ASU has proffered reasons for nonrenewing Plaintiff's contract.  These reasons are legitimate and nondiscriminatory.  In his deposition, Deputy Athletic Director Jones articulated ASU's reasons for nonrenewing Plaintiff's contract as (1) his contract was expiring on its own terms; (2) an investigation revealed "some merit" as to the players' and parents' complaints of misconduct by Plaintiff; and (3) Plaintiff disobeyed a directive not to return to practice after he was accused of having an altercation with a student athlete on the golf course.  (Jones Dep., at 23–25; Jones Aff. ¶ 7.)

The Eleventh Circuit has "repeatedly emphasized that provided the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it."  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1136 (11th Cir. 2020) (en banc).  And where the employer offers more than

one legitimate, nondiscriminatory reason, the employee must rebut each reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1037 (11th Cir. 2000) (en banc). To rebut the reasons and thus establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Gogel*, 967 F.3d at 1136. A reason is not pretextual unless it shown that the reason is "false" and that discrimination or retaliation is the "real reason." *Id.* (citation omitted).

Plaintiff has not demonstrated weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in ASU's reasons from which a reasonable factfinder could find them false or not the real reasons.   First, Plaintiff argues that "his performance as women's golf coach was such that it should have guaranteed him continued employment" (Pl. Summ. J. Br., at 22), but he points to no evidence that performance alone ensures renewal of a contract. The 2015 Contract he signed contains no such term. (Doc. # 20-5.)

Second, Plaintiff argues that Defendant's nondiscriminatory reasons for the nonrenewal of his contract are not the real reasons because the letter notifying him that his contract would not be renewed included no reasons. He argues that ASU is making a "post-hoc attempt" during litigation to justify the nonrenewal of his contract. (Pl. Summ. J. Br., at 18.) "Evidence of a post-hoc attempt to justify an

17

employment decision may be evidence of pretext." *Keaton v. Cobb Cnty.*, 545 F. Supp. 2d 1275, 1303 (N.D. Ga. 2008), *aff'd*, No. 08-11220, 2009 WL 212097 (11th Cir. Jan. 30, 2009).  But such evidence is missing here.  Plaintiff has not disputed that ASU was not required to give a reason under its employment policies.  (*See* ASU Manual at ASU INT DISC 000278 and 000331 (Doc. # 20-2).)  Plaintiff also has not refuted Jones's testimony that ASU officials met with him to discuss the initial complaints about his allegedly inappropriate interactions with two players on the women's golf team.  (Jones Dep., at 24; *see generally* Pl. Summ. J. Br.)  In other words, there is undisputed evidence that ASU informed Plaintiff of some of the complaints that had been made against him.  Additionally, Plaintiff admits that he knew at the time that, during the 2018–19 academic year, female student-athletes had lodged complaints against him, even if he did not know all of the specifics.  (Pl. Dep., at 79–81.)  This evidence cuts against an argument that the complaints were manufactured during litigation to explain the nonrenewal of Plaintiff's contract.  In any event, offering reasons for an employment decision that previously were undisclosed does not demonstrate pretext.  *Cf. Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("At most, the jury could find that performance was an additional, but undisclosed, reason for the decision; the existence of a possible additional nondiscriminatory basis for [the plaintiff's] termination does not, however, prove pretext.").  Here, the letter's failure to specify any reason for the

18

nonrenewal of Plaintiff's contract is not evidence from which it can be inferred that ASU's articulated reasons for the nonrenewal of his contract were false and that discrimination was the real reason.

Third, Plaintiff "vehemently disputes that he disobeyed any of the Defendant's directives, had an altercation with a student-athlete, and/or took actions violative of Title IX."[6]  (Pl. Summ. J. Br. at 3.)  For purposes of examining pretext, it can be assumed that Plaintiff is innocent of the charged misconduct.  That is because the pretext "inquiry is limited to whether [the] employer believed the employee was guilty of misconduct and if so, whether that was [the] reason behind [the adverse employment action]; that [the] employee did not actually engage in misconduct is irrelevant."  *Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) (citation omitted) (alterations added).  In other words, "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head."  *Id.*  Jones testified that the complaints against Plaintiff had "some merit."  (Jones Dep., at 23.)  The weight that ASU gave the athletes' complaints was a matter within its business judgment, and Plaintiff "is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the

---

[6] Notably, Plaintiff's denial that he was insubordinate or that an alleged altercation ensued between him and a female player, although asserted in his brief, is not in record.  Arguments in a brief are not a substitute for evidence.

employer." *Chapman*, 229 F.3d at 1030.  In an attempt to discredit ASU's reliance on the complaints, Plaintiff points to testimony that it was not uncommon for student-athletes and their parents to make complaints against coaches.  (Pl. Summ. J. Br., at 18 (citing Jones Dep., at 37–38).)  As already discussed, this evidence is conclusory.  It does not have enough heft to raise a genuine dispute of material fact that ASU did not honestly believe under the individual circumstances that the athletes' complaints had some merit or that sex-based discrimination was the real reason for the decision not to renew Plaintiff's contract.  *See generally Alvarez*, 610 F.3d at 1268 (discussing evidence that "is too weak to raise a genuine fact issue").

Fourth, Plaintiff argues that it is "illogical" to fire "the most successful golf coach . . . in the history of the school."  (Pl. Summ. J. Br., at 17.)  That may be so, but Plaintiff's argument does not meet "head on" ASU's proffered legitimate reasons for the nonrenewal of his contract; the asserted reasons for the nonrenewal focused solely on his alleged misconduct.  *Chapman*, 229 F.3d at 1030 ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.").

The reasons ASU advanced satisfy the standard of being ones that might motivate an employer to not renew a coach's contract, and Plaintiff has failed to create a genuine dispute of material fact on the issue of pretext for his Title IX claim

alleging discrimination in the nonrenewal of his contract.   ASU is entitled to summary judgment on Plaintiff's Title IX claim alleging discrimination in the nonrenewal of his contract.

### 2.   *Disparate Pay*

For purposes of his disparate pay claim, Plaintiff can satisfy the fourth element requiring comparability by showing that he "occupies a job similar to that of higher paid" coaches of men's sports teams.   *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1019 (11th Cir. 1994).   In his brief, Plaintiff points to evidence that, as the women's golf coach, he earned less than the head coaches for football, men's basketball, and baseball, and he has submitted evidence to prove it.[7]   (Pl. Summ. J. Br., at 17 (citing Head Coach Salaries (Doc. # 23-3); Pl. Decl. ¶¶ 41–44).)   At his deposition, he also testified that he made less than the assistant coaches for football, men's basketball, baseball men's track, men's tennis, and men's cross-country.   (Pl. Dep., at 48–52.)   The fact that these coaches earned higher salaries than Plaintiff is not enough to meet his burden; Plaintiff must, but fails to, show that his comparators' coaching jobs were similar to him.   (*See* Pl. Summ. J. Br., at 16–17.)   He has not attempted to draw a comparison between his duties and the duties of assistant

---

[7] For his comparisons, Plaintiff focuses on the amount of his salary that was allocated from the women's golf budget, and not on his total salary, even though his position was a "blended" one of coaching a men's team and a women's team under one salary and contract.   (*See* Pl. Summ. J. Br., at 17.)   Because Plaintiff has not shown that any of the coaches are similarly situated, the court does not address ASU's arguments against Plaintiff's method for highlighting salary differences.

coaches or between his duties and the duties of the head coaches for football, men's basketball, and baseball. Making assumptions about similarities of job duties is improper.

Even if it is assumed that these head and assistant coaches are proper comparators, Plaintiff is unable to rebut ASU's legitimate, nondiscriminatory reasons for the differences in pay. ASU's deputy athletic director attests that a head coach's salary is configured based on multiple factors, including the number of student athletes on the sport's roster, the number of staff the coach supervises, the coach's performance, and the demand for the sport. (Jones Aff. ¶ 6.) There is nothing discriminatory on its face about this multifaceted matrix for salary configurations that results in wide-ranging salaries for head coaches.

Plaintiff argues that the pay disparity is discriminatory because he "established a standard of excellence within ASU's women's golf program that previously did not exist and that remains unparalleled . . . ." (Pl. Summ. J. Br., at 17.) There is no dispute that the women's golf team excelled under Plaintiff's coaching in terms of championship titles and academic scores; however, Defendant has submitted evidence that the successes of the women's golf team on the course and in the classroom were not the only criteria used to establish the head coach's salary. Plaintiff's evidence fails to address or contradict the deputy athletic director's testimony concerning other relevant salary considerations of roster size, staff size,

and the demand for the sport.  For instance, Plaintiff does not refute the evidence that there were fewer athletes on the women's golf team (seven per Plaintiff's testimony, *see* Pl. Dep., at 51) than on the football team, the men's basketball team, the baseball team, and the men's track team.  (*See* Equity in Athletics Report, at 7 (Doc. # 23-4).)  Plaintiff cannot show pretext on evidence that the women's golf team outranked the men's sports teams in titles and grades when those factors are not the only ones that determine a head coach's salary.

Additionally, concerning the pay of assistant coaches, Plaintiff's contract reveals that as the head coach, he received a salary pool for paying assistant coaches, and that the number of assistant coaches was dependent on the rules set by the SWAC and the NCAA.  (2015 Contract, at 4.)  There is no evidence that the difference in pay Plaintiff received as compared to the pay of the assistant coaches of the men's sports teams he identifies is based on sex discrimination.[8]  Defendant is entitled to summary judgment on Plaintiff's Title IX disparate pay claim.

---

[8] At least two decisions support the conclusion that the varied methods for computing salaries ends the analysis at the prima facie case stage.  *See Smith v. Thomasville Georgia*, 753 F. App'x 675, 697 (11th Cir. 2018) (holding that the fact that the proposed comparators were hired at the same time as the plaintiffs did not prove that the comparators were similarly situated where "length of service" was "not the only proper measure for determining pay"); *Hall v. Ala. State Univ.*, No. 2:16-CV-593-GMB, 2019 WL 137593, at *10 (M.D. Ala. Jan. 8, 2019) ("[T]he pay of the assistant coaches is not determined in the same way as for a head coach. The court cannot conclude, therefore, that the assistant and associate baseball coaches are appropriate comparators for Hall [a head coach].").

### 3.   *Convincing Mosaic*

Plaintiff argues that his failure to satisfy the traditional *McDonnell Douglas* framework is not fatal to his claims.  He contends that his claims should survive summary judgment because he has presented a convincing mosaic of circumstantial evidence of discrimination that creates a genuine dispute of material fact for trial. (Pl. Summ. J. Br., at 16–17.)   Plaintiff is correct that "the *McDonnell Douglas* framework is not, and was never intended to be the sin qua non for a plaintiff to survive summary judgment in an employment discrimination case."   *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) ("*Lewis II*").  The Eleventh Circuit has recognized that "the 'convincing mosaic' analysis is an alternative to the *McDonnell Douglas* framework for a plaintiff to satisfy her burden to show on circumstantial evidence that her employer discriminated against her."   *Bailey v. Metro Ambulance Servs., Inc.*, 992 F.3d 1265, 1273 n.1 (11th Cir. 2021) (citing *Smith*, 644 F.3d at 1328).

Evidence of a convincing mosaic can be shown by (1) "systematically better treatment of similarly situated employees," (2) that "the employer's justification is pretextual," and (3) "suspicious timing, ambiguous statements . . . , and other bits and pieces from which an inference of discriminatory intent might be drawn." *Lewis II*, 934 F.3d at 1185.  "The phrase 'convincing mosaic' is not a legal test but rather

a metaphor to illustrate that the evidence should be viewed as a whole, not 'sorted into boxes,' to determine whether it creates an inference of unlawful discrimination." *Anterio v. City of High Springs Fla.*, 762 F. App'x 891, 897 (11th Cir. 2019) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–65 (7th Cir. 2016)).

Viewing the evidence in the light most favorable to Plaintiff, the court finds that Plaintiff has not presented a convincing mosaic. For reasons already articulated, Plaintiff has not shown that any of his comparators meet *Lewis I*'s standard for demonstrating a similarly situated comparator. His evidence lacks the substantiality required to make it relevant as circumstantial indicia of discrimination. *Cf. Lewis II*, 934 F.3d at 1187 (holding that, even though the comparators did not satisfy *Lewis I's* "strict definition of similarly situated comparators, the evidence of their treatment in the face of physical limitations on their ability to perform as police officers [was] not irrelevant" in examining whether there was a convincing mosaic of circumstantial evidence of discrimination). As discussed, Plaintiff also has not cast doubt on each of ASU's asserted nondiscriminatory reasons for the nonrenewal of his contract or for the pay differences in the coaches' salaries for men's sports teams. Evidence of pretext is wholly lacking.

Plaintiff's remaining evidence presumably is offered to show acts of arbitrariness. First, Plaintiff points to the elimination of his car allowance in his 2018 contract. But he has not presented evidence that contradicts the deputy athletic

director's testimony that ASU eliminated car allowances at the same time for all non-revenue producing sports, which included the women's golf team.  (Jones Dep., at 50–51.)  The elimination of the car allowance might be unfair, but there is no evidence that it was an act targeted against Plaintiff based on his status as the coach of a women's sports team.

Second, Plaintiff argues additional inequities between the allocation of resources to the women's golf team and to other men's sports teams, including the denial of senior portraits for the 2017 and 2018 graduates on the women's golf team and the failure of ASU to reimburse one of his female players for medical treatment. These alleged inequities "rest . . .  on the idea that there is discriminatory intent towards the 'female sports teams.'"  *Hall v. Ala. State Univ.*, No. 2:16-CV-593-GMB, 2019 WL 137593, at *9 (M.D. Ala. Jan. 8, 2019).  But "actions taken against the team on the basis of gender are not actionable for [Plaintiff]," and Plaintiff has not shown how these actions impacted his employment terms.  *Id.*

His best evidence of arbitrariness is ASU's withholding of the championship rings, notwithstanding ASU's post-litigation offer to deliver one of those rings (Doc. # 25-4); his having to pay expenditures out of his pocket; and the alleged contractual breaches (*see* Pl. Summ. J. Br., at 10, 17–18).[9]  This evidence is too insubstantial to

---

[9] The evidence surrounding out-of-pocket expenditures and contractual breaches is disputed.  It is construed in the light most favorable Plaintiff for purposes of resolving the summary judgment.  The court does not speak to the merits of whether ASU breached a contract.

push this case into the four corners of a convincing mosaic that establishes an inference of discrimination. The court has considered the evidence "as a whole" and has determined that it does not create an inference of Title IX discrimination in the terms and conditions of Plaintiff's employment pertaining to the nonrenewal of his contract and his pay. *Anterio*, 762 F. App'x at 897.

## B.     The State-Law Claim for Breach of Contract

A district court may decline to exercise supplemental jurisdiction over state-law claims when it has dismissed all federal-law claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3); *see also Raney v. Allstate Ins. Co.,* 370 F.3d 1086, 1089 (11th Cir. 2004) (While the decision to exercise supplemental jurisdiction is discretionary, the Eleventh Circuit "ha[s] encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial."). Exercising its discretion, the court declines to retain supplemental jurisdiction over the state-law claim for breach of contract.

## V.  CONCLUSION

Plaintiff has failed to establish a genuine dispute of material fact on his Title IX claims asserting discrimination in the nonrenewal of his contract and in his pay. Accordingly, it is ORDERED that Defendant's motion for summary judgment (Doc. # 18) is GRANTED.

Supplemental jurisdiction over the state-law claim is DECLINED.

Final judgment will be entered separately.

DONE this 10th day of February, 2022.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE